# In the United States Court of Federal Claims

No. 09-827C
Filed: May 5, 2010
Reissued: May 14, 2010[*]
**TO BE PUBLISHED**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| | \*   Federal Acquisition Regulation 9.1 |
| | \*      (Responsible Prospective Contractors); |
| BENEFITS CONSULTING ASSOCIATES, LLC, | \*   Federal Acquisition Regulation 15.201 |
| | \*      (Exchanges with Industry Before Receipt |
| Plaintiff, | \*      of Proposals); |
| | \*   Federal Acquisition Regulation 15.305 |
| v. | \*      (Proposal Evaluation); |
| | \*   Federal Acquisition Regulation 15.306 |
| THE UNITED STATES, | \*      (Exchanges with Offerors After Receipt |
| | \*      of Proposals); |
| Defendant, | \*   Federal Acquisition Regulation 15.506 |
| | \*      (Post-Award Debriefing of Offerors); |
| and | \*   Federal Acquisition Regulation 52.215-8 |
| | \*      (Order of Precedence – Uniform Contract |
| BENALYTICS CONSULTING GROUP, | \*      Format); |
| | \*   Federal Acquisition Regulation 52.219-9 |
| Defendant-Intervenor. | \*      (Small Business Subcontracting Plan); |
| | \*   Intervenor, RCFC 24(a); |
| | \*   Judgment on the Administrative Record, |
| | \*      RCFC 52.1; |
| | \*   Post-Award Bid Protest; |
| | \*   Standing. |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Isaias Cy Alba, IV**, Piliero Mazza PLLC, Washington, D.C., Counsel for Plaintiff.

**Joshua Ethan Kurland**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for Defendant.  **Angela E. Clark** and **John P. Sholar**, United States Securities and Exchange Commission, Washington, D.C., Of Counsel.

**Holly Emrick Svetz**, Womble Carlyle Sandridge & Rice PLLC, Tysons Corner, Virginia, Counsel for Defendant-Intervenor.

---

[*] On May 5, 2010, the court issued this Memorandum Opinion and Final Order under seal and instructed the parties to propose any redactions on or before the end of business on May 12, 2010.  On May 14, 2010, this Memorandum Opinion and Final Order is being reissued for publication with redactions, indicated by the designation "[deleted]."

## MEMORANDUM OPINION AND FINAL ORDER

**BRADEN,** *Judge*.

On December 1, 2009, a post-award bid protest was filed in the United States Court of Federal Claims challenging an August 19, 2009 award by the United States Securities and Exchange Commission ("SEC") of an employee Supplemental Health Benefits Program Contract with an estimated value of [deleted] over the potential five year term.  AR at 2168.

## I.    RELEVANT FACTUAL BACKGROUND.[1]

### A.    The Solicitation.

On February 27, 2009, the SEC posted a notice in advance of Solicitation Number SECHQ1-09-R-0076 ("Solicitation") for a Supplemental Health Benefits Program ("SHBP") Contract ("SHBP Contract").  AR at 2.  This notice stated that the "contractor shall be required to manage, market, and administer the SHBP [Contract] in its entirety."  AR at 2.

On April 22, 2009, the SEC Office of Human Resources issued a Solicitation requiring offerors to "provide SEC employees with a . . . SHBP consistent with the requirements of Title 26 of the Internal Revenue Code, Subtitle A, Chapter 1, Subchapter B, Part III, Section 125."  AR at 29.  The Solicitation's Scope of Work provided for one base contract year and four one-year options.  AR at 23-27.  The Solicitation allowed for a price adjustment over the term of the SHBP Contract, so long as any adjustment was subject to mutual agreement of the parties and a written modification.  AR at 28.

The April 22, 2009 Solicitation also provided that the SHBP "shall consist of (1) a dental plan and a vision plan that the SEC will provide to all employees and their eligible dependants nationwide; and (2) a package of voluntary benefits paid for entirely by the employee to include at minimum short- and long-term disability insurance."  AR at 29.  For both the dental plan and the vision plan, contractors were required to provide care from at least "A" rated insurance companies under either: "(1) an indemnity plan[2] or (2) a managed care plan."[3]  AR at 33-34.  In addition, the Solicitation required that the SHBP contractor retain a full-time on-site customer service representative, that would have access to covered employees through a web application allowing employees direct online access to their personal SHBP accounts, to review personal

---

[1] The facts cited herein were derived from the December 11, 2009 Administrative Record and the January 4, 2010 Supplemental Administrative Record ("AR 1-5602").

[2] Under an indemnity plan, premiums are paid to an insurance company that, in turn, pays medical professionals for the treatments provided.  AR at 33.

[3] Under a managed care plan, patients are required to select from a pool of providers.  AR at 33.  A managed care plan can be either a Preferred Provider Organization or a Health Maintenance Organization.  AR at 33.

benefits information, complete automated forms, and submit benefits transactions electronically. AR at 33-34.

In addition, the Solicitation required that the on-site customer service representative: (1) verify benefit eligibility and answer employee questions; (2) assist employees with enrollment and coordination; (3) assist insured employees with claims and resolve errors; (4) field customer service calls; and (5) distribute benefit availability information. AR at 36. The contractor's web application was to be designed to eliminate the SEC's need to create, staff, and maintain an information technology infrastructure. AR at 36. The Solicitation also required a detailed management plan that ensured the proper flow of information between the agency and the contractor and efficient internal management administration, as required by the Consolidated Omnibus Budget Reconciliation Act of 1986, Pub.L. No. 99-272, 100 Stat. 82 ("COBRA"). AR at 36.

The Solicitation further required that offerors submit a Business Proposal and a Technical Proposal separately. AR at 76. The Business Proposal was required to include: (1) a complete and signed Standard Form 33; (2) an acknowledgement of all Amendments; (3) Pricing/Costs; (4) Representations and Certifications; (5) the offeror's Tax Payer Identification Number; (6) a statement regarding financial condition, ratings from A.M. BEST, MOODY'S STANDARD & POORS, and FITCH, as well as ratings for proposed subcontractors; (7) the offeror's most recent financial statement; (8) corporate information/structure/plans for mergers and sales; (9) a brief narrative of all applicable discounts and profit sharing programs for proposed dental and vision insurance plans; (10) complete and signed non-disclosure agreements for the Company and Employee; and (11) a Subcontracting Plan in accordance with Federal Acquisition Regulations ("FAR") 52.219-9 (Small Business Subcontracting Plan). AR at 76-77.

The Technical Proposal was required to address the Solicitation requirements in a "straightforward, complete, and concise manner." AR at 77. The Technical Proposal was not to refer to the pricing requirements of the SHBP, but could address applicable group discounts that may apply to voluntary benefits. AR at 77. Offerors were instructed to divide the Technical Proposal into three parts: (1) Technical Capability; (2) Past Performance; and (3) Management Approach. AR at 77-78.

All offers were to be evaluated utilizing a "two-tier approach:" first, by a Technical Evaluation Panel ("TEP"); and then by a Source Selection Authority ("SSA"). AR at 820.

**B.      The Technical Evaluation Panel Evaluation.**

**1.      Duties.**

The TEP's duties were to "ensure a comprehensive evaluation" of each offeror's submission in accordance with the Source Selection Plan and the evaluation factors described in the Solicitation, and to:

- Maintain a full commitment to the evaluation process until the evaluation was complete, a decision was reached by the SSA, and the contract was awarded;
- Evaluate each proposal in an impartial and equitable manner and report findings to the TEP Chair;
- Evaluate proposals based on the information provided;
- Evaluate each proposal only against the established evaluation criteria and ensure that proposals are not compared against one another;
- Identify and fully document proposal strengths, weaknesses, and clarifications, as well as provide an overall assessment of each proposal;
- Participate in and/or assist in discussions and debriefings as required by the Contracting Officer.

AR at 821.

The TEP was to rate the proposals, based on how well the offerors met written and oral submissions and past performance information outlined in the Solicitation.  AR at 821.The TEP then was required to prepare a narrative description of the strengths, weaknesses, and any areas requiring clarification.  AR at 823.  The TEP Chair was responsible for writing a Final Evaluation Report to be submitted to the SSA.  AR at 827.

## 2.    Evaluation Criteria.

The Solicitation required the TEP to review all proposals, pursuant to the terms of the Solicitation and FAR Part 15, based on the following technical factors: (1) Technical Capability; (2) Past Performance; and (3) Management Approach.  AR at 77, 85, 1518.  Technical Capability was more important than Past Performance; Past Performance was more important than Management Approach.  AR at 85.

The following table summarizes the adjectival ratings to be assigned to each evaluation factor:

| Adjectival Rating | Definition |
| --- | --- |
| Outstanding | - The proposed approach indicates an exceptionally thorough and comprehensive understanding of the program goals, resources, schedules, and other aspects essential to performance of the program.<br>- In terms of the specific factor, the proposal contains strengths, exceptional features, or innovations that should substantially benefit the program.<br>- There are no weaknesses or deficiencies.<br>- The risk of unsuccessful contract performance is extremely low. |
| Commendable | - The proposed approach indicates a thorough understanding of the program goals and the methods, resources, schedules, and other aspects essential to performance of the program.<br>- The proposal has major strengths and/or minor strengths, which indicate the proposed approach will benefit the program. |

4

| | |
|---|---|
| | - Weaknesses, if any, are minor and are more than offset by strengths.<br>- The risk of unsuccessful performance is very low. |
| Satisfactory | - The proposed approach indicates an adequate understanding of the program goals and the methods, resources, schedules, and other aspects essential to performance of the program.<br>- There are few, if any, exceptional features to benefit the program.<br>- The risk of unsuccessful performance is low.<br>- Weaknesses are generally offset by strengths. |
| Marginal | - The proposed approach indicates a superficial or vague understanding of the program goals and the methods, resources, schedules, and other aspects essential to performance of the program.<br>- The proposal has weaknesses that are not offset by strengths.<br>- The risk of unsuccessful contract performance is moderate. |
| Unsatisfactory | - The proposed approach indicates a lack of understanding of the program goals and the methods, resources, schedules, and other aspects essential to performance of the program.<br>- Numerous weaknesses and deficiencies exist.<br>- The risk of unsuccessful performance is high. |

AR at 824-25.

### a.    The "Technical Capability" Factor.

The "Technical Capability" Factor required offerors to provide a matrix and a "narrative that describes proposed dental, vision, and voluntary benefit plans." AR at 77. Proposals were to be evaluated based on the degree to which they demonstrated an understanding of and met the technical requirements of the Solicitation. AR at 85.

### b.    The "Past Performance" Factor.

The "Past Performance" Factor required the TEP to evaluate each offeror's past performance and how those performances relate to an offeror's ability to perform the SHBP Contract. AR at 85. This factor also included a review of the size of past clients and responses to a questionnaire provided by the TEP. AR at 77-78. Pursuant to FAR 15.305, if an offeror did not have a record of past relevant performance or comparable information, the offeror would not be evaluated either favorably or unfavorably, but instead receive a neutral rating. AR at 78.

### c.    The "Management Approach" Factor.

The "Management Approach" Factor required the TEP to evaluate the overall soundness and effectiveness of the management approach of each offeror. AR at 85. The Solicitation required offerors to provide a narrative that specifically addressed marketing, communication, implementation, quality assurance, domestic partnership certification, and overall management of the contract. AR at 78.

### 3.      The Initial Review.

On May 8, 2009, the SEC's Contract Specialist hosted a SHBP pre-proposal conference with interested offerors.  AR at 198-205.  On May 29, 2009, offerors were notified that only those with proposals "in the competitive range" would be afforded an opportunity to make an oral presentation about their technical capabilities and management approaches.  AR at 367-68.  Offerors also were advised that the TEP would not specifically score the oral presentation, but the presentation would be taken into consideration when evaluating an offeror's technical proposal.  AR at 79.

On June 1, 2009, six timely proposals were submitted: Benefits Consulting Associates, LLC ("BCA" or "Plaintiff"); Benalytics Consulting Group, LLC ("Benaltyics" or "Defendant-Intervenor"); [deleted]; [deleted]; [deleted]; and [deleted].[4]  AR at 1518.

### a.      Benefits Consulting Associates, LLC's Initial Proposal.

BCA's initial proposal received a "Commendable" rating from the TEP with respect to Technical Capability, a "Neutral" rating for Past Performance, and a "Commendable" rating for Management Approach.  AR at 1520-22.

With respect to Technical Capability, the TEP was particularly impressed with BCA's vision benefits/discounts, preventative dental care, and voluntary benefits plan, all of which exceeded the Solicitation's requirements.  AR at 1520-21.  In addition, the TEP viewed the web portal with a single point of access for general staff and a second access route for HR staff, as a strength.  AR at 1520-21.  The TEP, however, assigned BCA a "Neutral" rating for Past Performance, even though BCA had "outstanding" client reviews.  AR at 1521, 1587-90.  With respect to Management Approach, the TEP commended BCA's "well defined, concise management plan that addressed all critical points."  AR at 1521.  In addition, BCA's proposal included a well developed Implementation Plan, with a backup to the customer service representative.  AR at 1521.  The TEP Chair's June 8, 2009 Memorandum did not note any weaknesses in BCA's Management Approach.  AR at 1522.

The TEP, however, did have some concerns about BCA's initial proposal.  AR at 1520-22.  Among those concerns were: the high cost of the program, compared to Benalytics; [deleted]; [deleted]; [deleted]; [deleted]; BCA did not include the ratings of its providers; [deleted]; and [deleted].  AR at 1511-16.  The TEP Chair also raised technical questions about: [deleted]; insufficient eyeglass frame discounts; [deleted]; [deleted]; and [deleted].  AR at 1521-22.

Overall, the TEP gave BCA's initial proposal a "Commendable" rating.  AR at 1518.

---

[4] [deleted]'s proposal was deemed unresponsive and was not evaluated.  AR at 1518.

b.      **Benalytics Consulting Group, LLC's Initial Proposal.**

Benalytics' initial proposal received a "Satisfactory" rating from the TEP with respect to Technical Capability, a "Neutral" rating for Past Performance, and a "Satisfactory" rating for Management Approach.  AR at 1522-23.

As for Technical Capability, the TEP viewed the variety of voluntary benefits in Benalytics' proposal as a strength, as well as the fact that the vision plan exceeded minimum requirements.  AR at 1522.  The TEP assigned BCA a "Neutral" rating for Past Performance, although the questionnaire returned by two prior clients gave Benalytics "outstanding" reviews. AR at 1556-65.  With respect to Management Approach, the COBRA administration, training sessions, and HR-only web portal access, were considered strengths.  AR at 1523.

The TEP, however, also expressed concerns about Benalytics' initial proposal.  AR at 1522-23.  For example, one TEP member noted that [deleted].  AR at 1510.  [deleted].  AR at 1510.  [deleted].  AR at 1522.  The TEP's general concern from a management standpoint was that there was a lack of clarity and organizational definition in the proposal.  AR at 1523.

Overall, the TEP assigned BCA's initial proposal a "Satisfactory" rating.  AR at 1518.

4.      **The Competitive Range Determination, Subsequent Oral Presentations, and Discussions.**

The TEP Chair's June 8, 2009 Memorandum summarized the TEP's evaluation of the five responsive proposals, as follows:

|  | Technical Capability | Past Performance | Management Approach | Overall |
|---|---|---|---|---|
| BCA | Commendable | Neutral | Commendable | Commendable |
| Benalytics | Satisfactory | Neutral | Satisfactory | Satisfactory |
| [deleted] | [deleted] | [deleted] | [deleted] | [deleted] |
| [deleted] | [deleted] | [deleted] | [deleted] | [deleted] |
| [deleted] | [deleted] | [deleted] | [deleted] | [deleted] |

AR at 1518-25.

Based on these evaluations, the TEP Chair recommended that BCA and Benalytics be included in the competitive range and invited to give oral presentations.  AR at 1525, 2163-64.

On June 18, 2009, BCA made an oral presentation.  AR at 1622.  During subsequent discussions, the TEP raised several concerns about BCA's proposal.  AR at 1734-36, 1764-70. The primary concern was BCA's failure to provide ratings for dental and vision providers, [deleted].  AR at 1743.  BCA responded that ratings were not necessary, because [deleted] was a non-profit organization.  AR at 1742-43.  Instead, BCA stated that it would provide other financial information about [deleted], and would provide ratings for [deleted]. AR at 1743.  The TEP also informed BCA that some of the proposed discounts for eyeglass frames failed to meet

the minimum requirements of the Solicitation. AR at 1521. BCA responded that, if awarded the contract, [deleted] would provide appropriate discounts. AR at 1741.

On June 19, 2009, Benalytics made an oral presentation. AR at 1651. During subsequent discussions, the TEP also asked Benalytics to provide additional financial information. AR at 1703, 1762. In addition, the TEP expressed concern about Benalytics' ability to comply with Section 508 of the Rehabilitation Act of 1973, 29 U.S.C. § 794d, that requires agencies to ensure that disabled and non-disabled federal employees have access to and use of comparable information and data. AR at 1703. Benalytics responded that it would be in full compliance. AR at 1703.

### 5. The Final Review.

On June 21, 2009, BCA and Benalytics were advised to submit any Final Proposal Revisions on or before July 9, 2009. AR at 1796-1804. Both offerors also were informed that the subsequent award of the contract would be made without engaging in any further discussions or accepting any further proposal revisions. AR at 1798, 1802. On July 8, 2009, the due date was extended to July 13, 2009. AR at 1805. On July 13, 2009, BCA and Benalytics submitted timely Final Proposal Revisions that included responses to the questions previously raised. AR at 1810, 1980.

### a. Benefits Consulting Associates, LLC's Final Proposal.

On July 13, 2009, BCA submitted a Final Proposal with responses to fifteen questions raised in the initial review and debriefing process. AR at 1810-1813. Despite the TEP's concerns about the lack of provider ratings, BCA elected to remain with [deleted] and [deleted]. AR at 1810-13, 2164. To allay concerns about [deleted]'s lack of an "A" rating, BCA provided audited January 30, 2009 financial statements for [deleted] and subsidiaries. AR at 1896.

In the TEP's Final Report, BCA was assigned a rating of "Satisfactory" for Technical Capability, "Neutral" for Past Performance, and "Commendable" for Management Approach. AR at 2158-59. As a result, BCA received a final rating of "Satisfactory." AR at 2157. Although the TEP again noted several strengths with BCA's Technical Capability, the TEP remained concerned about BCA's proposal, because BCA represented that it was "impossible" for the provider to modify the plan for "one specific group." AR at 2158. Accordingly, the TEP concluded that BCA was "unable to meet the SEC's minimum required discount" for eyeglass frames. AR at 2158. BCA received a final rating of "Neutral" for Past Performance, because the references BCA provided were deemed not to be of relevant size, but no weaknesses were noted with respect to Management Approach. AR at 2158.

### b. Benalytics Consulting Group, LLC's Final Proposal.

On July 13, 2009, Benalytics' submitted a Final Proposal. AR at 1980. Benalytics selected the following providers: Humana Specialty Benefits ("Humana") for dental and vision coverage; Principal Financial Group ("Principal") for short-term and long-term disability benefits; Liberty Mutual for group home and auto insurance; and Colonial Life for life insurance.

AR at 2012-55.  A.M. BEST[5] gave: Colonial Life an "A-" rating; Humana an "A-" rating; Liberty Mutual an "A" rating; and Principal an "A+" rating.  AR at 2092.

The TEP Final Report assigned Benalytics a rating of: "Commendable" for Technical Capability; "Neutral" for Past Performance; and "Commendable" for Management Approach. AR at 2159-60.  Overall, Benalytics received a rating of "Commendable."  AR at 2157.  The TEP did not note any weaknesses with Benalytics' Final Proposal and, except for Past Performance, the TEP noted several strengths.  AR at 2159-60.

Regarding Technical Capability, the TEP determined that Benalytics exceeded the Solicitation's minimum requirements for dental, vision, and voluntary benefits in several aspects. AR at 2159.  The most impressive feature was a web portal that included a single point of access for all services with two application interfaces, one for HR staff and one for general SEC staff. AR at 2160.   As for Past Performance, Benalytics received a "Neutral" rating, because Benalytics did not provide any relevant examples specific to benefits administration.  AR at 2160.  With respect to Management Approach, the TEP found that Benalytics' quality assurance strategy was strong, because the proposal discussed HR's access to the automated system and included enhanced COBRA administration.  AR at 2160.

### 6.      The Final Recommendation.

On July 15, 2009, the TEP Chair submitted a Final Report and Recommendation ("Final Report") recommending that the SSA award the SHBP Contract to Benalytics, because it "met and/or exceeded the Solicitation's minimum requirements and received an overall rating of Commendable."  AR at 2160.

### C.      The Source Selection Authority Evaluation.

### 1.      Duties.

The SSA for the Solicitation (*i.e.*, the Contracting Officer for the acquisition), was required to:

- Review and approve the Source Selection Plan, the evaluation criteria, and the ranking of the evaluation criteria;
- Appoint the chair and members of the TEP and ensure that members are properly trained;
- Approve the assignment of Advisors At-Large to review specific portions of the proposals;
- Ensure that conflicts of interest or appearances of conflict did not exist;
- Provide the TEP with guidance and special instructions for conducting the evaluation and selection process;

---

[5] A.M. BEST is a global credit rating agency dedicated to the financial and health-care service industries.  *See* http://www3.ambest.com/ratings/default.asp (last visited April 26, 2010). The firm's ratings are opinions, based on creditworthiness.  *Id.*

- Ensure that there was no premature or unauthorized disclosure of proprietary or source selection information;
- Ensure that the evaluation board properly evaluated the proposals against the stated evaluation criteria and monitored compliance with source selection "rules;"
- Decide whether to conduct discussions as defined in FAR Part 15.201 and how to conduct them;
- Evaluate "concurrently" all price proposals to identify strengths, weaknesses, and deficiencies;
- Conduct a debriefing of successful and unsuccessful offerors;
- Make the final award decision.

AR at 820-21, 827.

## 2. Criteria.

The Solicitation specified that the offeror providing the "best value" to the SEC would be awarded the SHBP Contract, based on: the Technical Capability of the proposal; the Past Performance of the contractor; the contractor's Management Approach; and the "reasonableness and fairness" of the price. AR at 85. The three technical factors weighed together, however, were considered more important than price. AR at 85. But, "the importance of price [increased] as the technical merit of the [p]roposals [became] more equal." AR at 85. The SEC reserved the right to waive proposal "informalities and minor irregularities" and make multiple awards, but could also reject any or all proposals if doing so was determined to be in the agency's interest. AR at 83. The Solicitation also allowed proposals to depart from stated requirements, but they must clearly identify why the acceptance would be "advantageous" to the SEC. AR at 84. Any deviations from the terms and conditions of the Solicitation were to be clearly identified and explicitly defined. AR at 84.

## 3. Evaluation Of The Technical Evaluation Panel's Recommendation And Contract Award.

On August 19, 2009, the SSA issued a Memorandum awarding Contract No. SECHQ1-09-C-0076 to Benalytics for a fixed price of [deleted]. AR at 2182. Therein, the SSA discussed concerns that the TEP had with BCA's final proposal. AR at 2164. The TEP was impressed with proposed dental and vision care options, including: preventative care treatments for covered dependents up to 19 years of age; increased eyeglass and contact lens coverage; the fact that BCA exceeded the minimum requirements for voluntary benefits; and a strong management approach with a well developed implementation plan. AR at 2164. BCA's failure to achieve the required in-network eyeglass frame discount and provide an acceptable rationale for using a non "A" rated vision provider, however, adversely affected the overall quality of the proposal. AR at 2164.

In contrast, Benalytics "met and/or exceeded the SEC's minimum requirements" and "there were no weaknesses in the Benalytics' technical approach." AR at 2165. In addition, the TEP was persuaded that: "Benalytics exceeded the SEC's minimum requirements for dental

major restorative care; Benalytics' voluntary benefits offering exceeded minimum requirements; and the web portal presented was impressive." AR at 2165. Accordingly, the TEP considered Benalytics lack of past performance as a neutral factor. AR at 2165. In addition, Benalytics "had no weaknesses in their management approach," as that proposal offered "enhanced COBRA administration, strong communication, education, marketing and quality assurance plans." AR at 2165.

The following table summarizes BCA's and Benalytics' pricing proposals over the term of the SHBP Contract:

|  | Benalytics | BCA | Difference |
|---|---|---|---|
| Base Year | [deleted] | [deleted] | 9% |
| Option Year One | [deleted] | [deleted] | 16% |
| Option Year Two | [deleted] | [deleted] | 15% |
| Option Year Three | [deleted] | [deleted] | 15% |
| Option Year Four | [deleted] | [deleted] | 13% |
| Total | [deleted] | [deleted] | 14% |

AR at 2165.

Based on this comparative analysis, the SSA concluded that price was not dispositive, but determined that "Benalytics' prices are . . . fair and reasonable," despite the 14% overall difference between Benalytics' and BCA's proposals. AR at 2165. The SSA also determined that Benalytics was "responsible within the meaning of FAR 9.1" and that "Benalytics does not appear on the EPLS website and received a favorable [Dun] and Bradstreet Rating." AR at 2166. Based on the TEP's evaluations and the SSA's additional analysis, the SSA concluded that "it is in the best interest of the Government to award Contract [No. SECHQ1-09-C-0076] to Benalytics in the estimated amount of [deleted] for the base year, with a total estimated contract value of [deleted]." AR at 2168.

### D.    The Post-Award Debriefing.

By an August 20, 2009 letter, BCA was informed that Contract No. SECHQ1-09-C-0076 was awarded to Benalytics, because the SSA determined it "submitted the proposal considered to be the best value to the Government, in accordance with the award criteria set forth in Section M of the [S]olicitation." AR at 2230. BCA also was informed that, if it desired a debriefing, in accordance with FAR 15.506, BCA must submit a written request within three calendar days following receipt of the letter. AR at 2230. On August 20, 2009, BCA requested a debriefing. AR at 2231.

On August 25, 2009, BCA was debriefed by telephone. AR at 2231. On August 26, 2009, BCA was informed in writing that BCA's final proposal "failed to meet some of the SEC's minimum requirements for vision." AR at 2233-35. First, the minimum discount for in-network eyeglass frames was 45% off usual and customary charges up to $130 and 80% of balance over $130. AR at 2233-35. BCA's proposal, however, only included a discount of [deleted] for frames up to [deleted], plus [deleted] off the amount over [deleted]. AR at 2233-35. On that

basis alone, "BCA could have been considered nonresponsive and removed from the competitive range based upon its failure to meet the SEC's minimum requirement(s)."  AR at 2234. Nevertheless, BCA was included in the competitive range and provided an opportunity to address this deficiency and other weaknesses.  BCA also was notified that it failed to meet the Solicitation's requirement that all providers must receive a minimum rating of "A" or better.  AR at 2234.  Finally, BCA was informed that Benalytics proposed an overall evaluated price 14% lower than BCA and, in analyzing the Past Performance factor, the SSA was concerned about the size of the firms that BCA previously serviced.  AR at 2234-35.  All of these factors together, resulted in BCA receiving a final overall rating of "Satisfactory."  AR at 2235.  In contrast, Benalytics received a final rating of "Commendable."  AR at 2235.

## II.    PROCEDURAL HISTORY.

### A.    At The Government Accountability Office.

On August 31, 2009, BCA filed a protest with the United States Government Accountability Office ("GAO") of the August 19, 2009 award.  AR at 3583.  On September 25, 2009, the SEC filed an Agency Report, including the Solicitation and TEP evaluations.  AR at 3614.  On November 24, 2009, BCA withdrew the protest at the GAO.  AR at 4056, 4058.

### B.    At The United States Court Of Federal Claims.

On December 1, 2009, BCA filed a Complaint in the United States Court of Federal Claims, under seal, alleging that the SEC improperly awarded Solicitation No. SECHQ1-09-R-0076 to Benalytics.  On the same day, BCA also filed: a Motion for a Protective Order; a Motion for a Temporary Restraining Order; a Motion for a Preliminary Injunction; and a Motion for leave to File Documents Under Seal.  On December 1, 2009, Benalytics filed a Motion to Intervene.  On December 2 and December 10, 2009, the court convened initial status conferences with the parties.

During the December 10, 2009 status conference, the Government indicated that work on Solicitation No. SECHQ1-09-R-0076 would not commence until March 15, 2010.  On December 11, 2009, the court entered an Order: granting BCA's Motion to File Documents Under Seal; granting Benalytics' Motion to Intervene; directing the parties to confer as to the scope and content of the Administrative Record, in accordance with *Axiom Resource Management, Inc.* v. *United States*, 564 F.3d 1374, 1379-81 (Fed. Cir. 2009); requiring the Government to file the Administrative Record via CD-ROM, under seal, no later than December 11, 2009; and any additional documents later identified as properly part of the Administrative Record by December 23, 2009; denying BCA's Motion for a Temporary Restraining Order; and deferring ruling on BCA's Motion for a Preliminary Injunction.

On December 11, 2009, the Government filed the Administrative Record via CD-ROM and under seal.  On December 23, 2009, the Government filed a Consent Motion For Extension Of Time to file the remainder of the Administrative Record, that the court granted on December 28, 2009.  On January 4, 2010, the Government filed the remainder of the Administrative Record under seal.

On December 30, 2009, BCA filed a First Amended Complaint ("First Am. Compl."), concurrently with a Motion for Judgment on the Administrative Record ("Pl. Mot."), and a Memorandum in Support.  On January 20, 2010, the Government filed a: Motion to Dismiss, Opposition to Plaintiff's Motion for Judgment on the Administrative Record, and Cross-Motion for Judgment on the Administrative Record ("Gov. Mot.").  On the same date, Benalytics filed a Motion for Judgment on the Administrative Record and Opposition to the Motion for Judgment on the Administrative Record of Benefits Consulting Associates, LLC ("Int. Mot."), accompanied by a Memorandum in Support.  On January 28, 2010, BCA filed a Response to the Government's and Benalytics' Motions for Judgment on the Administrative Record ("Pl. Resp.").  On February 5, 2010, the Government filed a Reply ("Gov't Reply").  On the same date, Benalytics also filed a Reply ("Int. Reply").

On January 14, 2010, the Government filed a Motion requesting the court to request a GAO Advisory Opinion.  On January 28, 2010, BCA filed a Consent Motion to Supplement the Administrative Record.  On February 12, 2010, the court held a status conference with the parties to discuss these motions.

On March 5, 2010, the Government filed a Status Report, indicating that, at the court's request, the SEC would not award Contract No. SECHQ1-09-C-0076 until April 30, 2010.  On March 8, 2010, the court denied the Government's January 14, 2010 Motion Requesting a GAO Advisory Opinion and deferred ruling on BCA's January 28, 2010 Consent Motion to Supplement the Administrative Record.

On April 7, 2010, the court held an oral argument on the pending Motions for Judgment on the Administrative Record ("4/7/10 TR 1-96").  On April 8, 2010, the court denied Plaintiff's December 1, 2009 Motion For Preliminary Injunction, allowing the SEC to award and implement Contract No. SECHQ1-09-C-0076.  Order, *Benefits Consulting Assocs., LLC* v. *United States*, No. 09-827C (Apr. 8, 2010).  The court advised the parties that a Memorandum Opinion and Order regarding BCA's December 30, 2009 Motion for Judgment on the Administrative Record would follow.

## III.   DISCUSSION.

### A.     Jurisdiction.

Pursuant to 28 U.S.C. § 1491(b)(1), the United States Court of Federal Claims has jurisdiction:

> to render judgment on an action by an interested party objecting to a solicitation by a federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or proposed procurement.

*Id.*

The December 1, 2009 post-award bid protest Complaint in this case alleges that the SEC's October 6, 2009 contract award to Benalytics was "arbitrary, capricious and otherwise

contrary to law and regulation," in violation the Administrative Procedure Act, 5 U.S.C. § 706 ("APA").  Compl. ¶¶ 36-87; *see also* First Am. Compl. ¶¶ 37-91.

### B.       Standing.

#### 1.       The Plaintiff's Standing.

As a threshold matter, a plaintiff contesting the award of a federal contract must establish that it is an "interested party" to have standing under 28 U.S.C. § 1491(b)(1).  *See Myers Investigative & Sec. Servs.* v. *United States*, 275 F.3d 1366, 1369-70 (Fed. Cir. 2002) ("[S]tanding is a threshold jurisdictional issue[.]").  The United States Court of Appeals for the Federal Circuit has construed the term "interested party" as synonymous with "interested party," as defined by the Competition in Contracting Act ("CICA"), 31 U.S.C. § 3551(2)(A).  *See Rex Serv. Corp.* v. *United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (citing decisions adopting the CICA definition of "interested party" for 28 U.S.C. § 1491(b)(1) purposes).  A two-part test is applied to determine whether a protester is an "interested party:" (1) the protestor must show that it was an actual or prospective bidder; and (2) the protester must have a direct economic interest in the procurement.  *See Distrib. Solutions, Inc.* v. *United States,* 539 F.3d 1340, 1344 (Fed. Cir. 2008) ("[T]o come within the [United States] Court of Federal Claims' section 1491(b)(1) bid protest jurisdiction, [the protester] is required to establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest.") (citations omitted).

In addition to establishing "interested party" status, a protestor must show that the alleged errors in the procurement were prejudicial.  *See Labatt Food Serv., Inc* v. *United States*, 577 F.3d 1375, 1378-79 (Fed. Cir. 2009) ("It is basic that 'because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits.'"); *see also Myers*, 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing.").

#### a.       The Parties' Arguments.[6]

#### (1)       The Government's Argument.

The Government argues that BCA does not have standing, because BCA's final proposal failed to comply with the requirements of the Solicitation, by attempting to have the ratings of "sister companies" imputed to [deleted].  Gov't Mot. at 12.  Proposals that fail to satisfy material Solicitation terms may not form the basis of an award and BCA admits to such a failure.  *Id.*  If a firm submits a nonresponsive bid, it has no chance of receiving the award and no standing to protest.  *Id.*; *see also* 4/7/10 TR at 7:8-13.  Irrespective of the TEP's decision to evaluate BCA's non-responsive proposal, that fact does not cure BCA's lack of standing.  Gov't Mot. at 13.

---

[6] Benalytics' January 20, 2010 Motion For Judgment On The Administrative Record and February 5, 2010 Reply did not challenge BCA's standing.

**(2)    Plaintiff's Response.**

BCA responds that it was an actual bidder. Pl. Resp. at 3.  In addition, BCA's economic interests adversely were affected by the award of Contract No. SECHQ1-09-C-0076 to Benalytics.  *Id.*  Therefore, BCA is an interested party.  *Id.*  Moreover, BCA has not admitted that its proposal did not comply with the Solicitation.  *Id.*   Accordingly, BCA has standing to bring this action.  *Id.*

**(3)    The Government's Reply.**

BCA does not address the lack of standing arising from the nonresponsiveness of its bid, but instead argues that standing is derived from the need for the court to address the merits. Gov't Reply at 2.   BCA's providers were unrated and BCA failed to meet the eyeglass frame discount requirement.  *Id.* at 3-4.  Since BCA's proposal was facially non-compliant, it does not have standing to challenge any aspect of this procurement.  *Id.*

**b.    The Court's Resolution.**

In this case, BCA was an actual bidder on Contract No. SECHQ1-09-C-0076 and the SSA's August 19, 2009 award to Benalytics directly affects BCA's economic interests, rendering BCA an "interested party" as a matter of law.  *See Distrib. Solutions,* 539 F.3d at 1344. Although six companies submitted proposals in response to the Solicitation, BCA was the only firm, other than Benalytics, that the TEP determined was in the "competitive range."  AR at 1525.   Because of this status, BCA had a "substantial chance" of being awarded the SHBP Contract, despite the deficiencies in BCA's initial proposal.  *See Bannum, Inc.* v. *United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005) ("To establish prejudice [Plaintiff] was required to show that there was a 'substantial chance' it would have received the contract award but for . . . errors in the bid process.") (citations omitted).  Therefore, the threshold prejudice requirement is met. *Id.*  For these reasons, the court has determined that BCA has standing to pursue this bid protest in the United States Court of Federal Claims.[7]

**2.    The Defendant-Intervenor's Standing.**

The United States Court of Appeals for the Federal Circuit requires that the trial court evaluate three factors in determining whether intervention is timely: "(1) the length of time

---

[7] In the alternative, the Government also argues that "by admitting that [BCA's] proposal did not comply with one or more material [S]olicitation requirements, BCA fails to make a legally sufficient claim for relief."  Gov't Mot. at 12.  BCA, however, does not concede that the final proposal failed to comply with material terms and conditions of the Solicitation and the SSA could have awarded Contract No. SECHQ1-09-C-0076 to BCA.  Pl. Resp. at 2-3.  The court has determined that the First Amended Complaint satisfies the requirements of RCFC 12(b)(6) and the Government's alternative argument concerns the merits of the protest.  *See E.W. Bliss* v. *United States*, 77 F.3d 445, 448 (Fed. Cir. 1996) (holding that "a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations").

during which the would-be intervenors actually knew or reasonably should have known of [their] right[s;] (2) whether the prejudice to the rights of existing parties by allowing intervention outweighs the prejudice to the would-be intervenors by denying intervention[;] (3) existence of unusual circumstances militating either for or against a determination that the application is timely." *Belton Indus., Inc.* v. *United States*, 6 F.3d 756, 762 (Fed. Cir. 1993) (citations omitted; certain alterations in original); *see also* RCFC 24(a)(2).[8]  In addition, our appellate court has advised that "the requirements for intervention are to be construed in favor of intervention." *Am. Mar. Transp., Inc.* v. *United States,* 870 F.2d 1559, 1561 (Fed. Cir. 1989).

### a.        Defendant-Intervenor's Motion Was Timely.

In this case, Benalytics filed a Motion To Intervene the same day BCA filed the Complaint.  Therefore, the court has determined that Benalytics' December 1, 2009 Motion To Intervene was timely.  *See* RCFC 24(a).

### b.        Defendant-Intervenor Has An Interest In The Contract Award At Issue.

Benalytics also has established "an interest relating to the . . . transaction that is the subject of [this] action," because Benalytics' proposal was determined to be in the "competitive range."  AR at 1525.  Therefore, the court has determined that any final judgment in favor of BCA necessarily would "impair" Benalytics' "ability to protect its interest."  RCFC 24(a).

### c.        Defendant-Intervenor's Interest Cannot Adequately Be Represented By The Parties.

Benalytics argues that neither BCA nor the Government adequately can represent Benalytics' interest.  Int. Mot.; Int. Reply.  The Government does not suggest otherwise.  Therefore, the court has determined that Benalytics' interest cannot adequately be represented by the parties.  *See* RCFC 24(a).

### d.        The Court's Resolution.

In addition to satisfying the jurisdictional requirements for standing, no party opposed Benalytics' motion and the court is unaware of any prejudice to the existing parties or unusual

---

[8] Rule 24(a)(2) of the United States Court of Federal Claims provides, in relevant part, that:

> On timely motion, the court must permit anyone to intervene who . . . claims an *interest relating to the property or transaction that is the subject of the action*, and is so situated that the *disposition of the action may* as a practical matter *impair or impede the movant's ability to protect its interest*, unless existing parties adequately represent that interest.

RCFC 24(a)(2) (emphasis added).

circumstances that would require Benalytics to be denied full intervention rights. *See* RCFC 24(a). For these reasons, on December 11, 2009, the court granted Benalytics' Motion to Intervene.

### C.    Standard Of Review On A Motion Upon The Administrative Record.

Pursuant to the Tucker Act, as amended by the Administrative Dispute Resolution Act, Pub.L. No. 104-320, § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996), the United States Court of Federal Claims reviews challenges to agency decisions, pursuant to the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see also* 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"); *Banknote Corp. of Am. Inc.* v. *United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'") (citations omitted).

The United States Court of Appeals for the Federal Circuit has held that a bid award may be set aside if: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Weeks Marine, Inc.* v. *United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009) (quotations and citations omitted). When a party's challenge is based on regulatory or procedural violation, "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Axiom Res. Mgmt.*, 564 F.3d at 1381 (quotations and citations omitted). This burden is even greater when the procurement is a "best value" procurement, as is the case here. *See Galen Med. Assocs.*, 369 F.3d at 1330 ("As the contract was to be awarded based on 'best value,' the contracting officer had even greater discretion . . . [t]he relative merit of competing proposals is primarily a matter of administrative discretion.") (citations omitted); *see also Unisys Corp.* v. *Widnall*, 98 F.3d 1325, 1327 (Fed. Cir. 1996) ("In determining whether the agency has complied with the regulation authorizing best value procurement, the [reviewing authority] may overturn an agency's decision if it is not grounded in reason.").

On the other hand, when the challenge is that an award decision was made without a rational basis, the trial court must "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Centech Group, Inc.* v. *United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009); *see also Savantage Fin. Servs.* v. *United States*, 595 F.3d at 1282, 1287 (Fed. Cir. 2010) ("We must sustain an agency action unless the action does not evince rational reasoning and consideration of relevant factors.") (internal alterations, quotations and citations omitted).

In the alternative, when the challenge is that the agency acted in an arbitrary or capricious manner, the court may interfere with a federal procurement "only in extremely limited

circumstances." *United States* v. *John C. Grimberg Co., Inc.*, 702 F.2d 1362, 1372 (Fed. Cir. 1983). This rule recognizes a zone of acceptable results in each particular case and requires that the final decision reached by an agency is the result of a process that "consider[s] the relevant factors" and is "within the bounds of reasoned decision making." *Baltimore Gas & Elec. Co.* v. *Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983); *see also Weeks Marine*, 575 F.3d at 1368-69 ("We have stated that procurement decisions invoke [] highly deferential rational basis review . . . [u]nder that standard, we sustain an agency action evincing rational reasoning and consideration of relevant factors.") (quotations and citations omitted).

A motion for judgment on the administrative record, pursuant to RCFC 52.1, is akin to an expedited trial on the record and has no counterpart in the Federal Rules of Civil Procedure. *See* RCFC 52.1, Rules Committee Note (July 13, 2009); *see also Bannum*, 404 F.3d at 1356 ("[T]he judgment on an administrative record is properly understood as intending to provide for an expedited trial on the record."); *A & D Fire Prot.* v. *United States*, 72 Fed. Cl. 126, 131 (2006) ("The resolution of RCFC 52.1 cross-motions is akin to an expedited trial on the paper record."). Accordingly, on a motion for judgment on the administrative record, the court first is required to determine whether the plaintiff has met the burden of proof to show that the agency's decision was not in accordance with the law. *See Bannum*, 404 F.3d at 1357 (instructing the trial court to make "factual findings under RCFC 56.1 from the [limited] record evidence as if it were conducting a trial on the record"); *see also Afghan Am. Army Servs. Corp.* v. *United States*, 90 Fed. Cl. 341, 355 (2009) ("In reviewing cross-motions for judgment on the administrative record, the court must determine 'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.'"). The existence of a material issue of fact, however, does not prohibit the court from granting a motion for judgment on the administrative record, nor is the court required to conduct an evidentiary proceeding. *See Bannum*, 404 F.3d at 1353-54 ("RCFC 56.1 requires the [United States] Court of Federal Claims, when making a prejudice analysis in the first instance, to make factual findings from the record evidence as if it were conducting a trial on the record.").

## IV.   CLAIMS RAISED BY PLAINTIFF'S DECEMBER 30, 2009 FIRST AMENDED COMPLAINT.

The First Amended Complaint and BCA's briefs in support assert a number of claims, including that: the TEP improperly evaluated Benalytics' financials; the TEP evaluated past performance in a disparate manner; there was ambiguity about whether the receipt of commissions for voluntary benefits was allowed; and Benalytics had an organizational conflict of interest. Pl. Mot. at 13-22, 29-34; *see also* Pl. Resp. at 8-18. At oral argument, however, BCA clarified and "distilled" these claims "into two legal arguments . . . One would be misleading [agency] discussions, the other would be unequal treatment" of BCA's and Benalytics' proposals. 4/7/10 TR at 14:24-15:3.

### A.   Misleading Agency Discussions Claims.

BCA argues that the TEP misled BCA as to the acceptability of BCA's final proposal, by failing to inform BCA that the alternative financial data submitted instead of "A" ratings for

providers and failure to provide eyeglass frame discounts prior to award were unacceptable, but instead only asked questions about these items.  4/7/10 TR at 20:19-22; 21:13-20.

BCA summarized the TEP's misleading communications in this way:

> I liken it to if you wanted a car, and you wanted a fire-engine red car, and I brought you a maroon car, and you told me, well, why are you bringing me a maroon car, why can't you bring me a different car, something like that – instead of telling me, no, no, no, I said fire-engine red.  Instead, you're asking me, well, why did you bring me maroon.  And then I explain to you my facility has this kind of paint and that kind of paint, and we can put it together, and that's why I brought you my maroon car.  And then you turn around and say, oh, I don't want it.  Well, why don't you want it?  Well, it's not fire-engine red.  Well, why didn't you tell me that?  I could have fixed it.

4/7/10 TR at 32:15–33:3.

### 1.      "A" Ratings.

#### a.      The Parties' Arguments.

##### (1)      Plaintiff's Argument.

First, BCA asserts that the misleading communications concerned the Solicitation requirements that proposed vision and dental providers must have an "A" rating.  Pl. Resp. at 4. Although BCA proposed all unrated dental and vision providers, the financial data provided to the TEP confirmed that both would qualify as "A" rated or better.  *Id.* at 4-6.  The TEP, however, never informed BCA that the proposed unrated providers were unacceptable and repeatedly implied that the financial information submitted would be accepted in lieu of an actual rating.  *Id.* at 4 (citing AR at 1766).  If the TEP refused to accept this surrogate information, at least, it should have informed BCA so an "A" rated insurer could be substituted.  *Id.* at 5; *see also* 4/7/10 TR at 20:14-22; 21:1-3.  Allowing the TEP to reject the financial information of BCA's providers is placing form over substance.  Pl. Resp. at 5-6 (citing *Squires Timber Co.*, B-298859, 2006 CPD ¶ 181 (Comp. Gen. Dec. 1, 2006)).

##### (2)      The Government's Response.

The Government responds that the fact that BCA's provider "sister companies" are "A" rated is irrelevant, since the Solicitation required all providers to have an "A" rating.  Gov't Mot. at 16.  Therefore, it was not an abuse of discretion for the TEP to reject BCA's attempt to substitute financial data for actual compliance with the Solicitation.  *Id.*  Moreover, after this problem was raised, BCA responded by simply resubmitting non-compliant financial statements about BCA's provider debt, reserves, and associations with rated companies, instead of providing a comprehensive quantitative and qualitative evaluation that a rating agency would have provided.  *Id.*  Since BCA failed to explain how its unrated providers met the "A" rating requirement, a material requirement of the Solicitation was not met.  *Id.* at 17-18.

BCA's reliance on *Squires Timber* is misplaced.  In that case, a bidder was disqualified, because of an arithmetic error in an otherwise compliant proposal.  Gov't Mot. at 8-9.  The court should reject BCA's argument that the TEP should have accepted provider sister companies' ratings, because the Government is entitled to require that the subcontractor meet the Solicitation's requirements.  Gov't Reply at 9.  BCA provided no information about the relationship between proposed vision and dental providers and "sister companies" or the scope and limitations of underwriting agreements or other legal obligations between them, rendering these relationships irrelevant to BCA's obligation to comply with the Solicitation.  *Id.*  For this reason, the TEP did not act in an arbitrary or capricious manner in determining that [deleted] and [deleted] failed to meet the "A" rating requirement.  *Id.* at 10.

Moreover, there is nothing in the Administrative Record to suggest the TEP misled BCA. *Id.* at 6.  BCA promised to provide "other financial audit info" regarding the proposed provider when, in fact, it simply resubmitted information previously provided.  *Id.* at 7.  Agencies are not required to "spoon-feed" offerors about deficiencies in their proposals.  *Id.*  If BCA believed the "A" rating requirement was unduly restrictive, BCA was obligated to object when the Solicitation was first issued.  *Id.* at 8; *see also* 4/7/10 TR at 50:2-12.

### (3)    **Defendant-Intervenor's Response.**

Benalytics adds that the Solicitation notified all parties that providers must have "A" ratings.  Int. Mot. at 9-10.  After receiving notice of this requirement, BCA did not question the requirement or ask whether the TEP would consider financially sound, but unrated, companies as substitutes.  *Id.* at 9.  In any event, at no time prior to the contract award did BCA complain that the "A" rating requirement was unduly restrictive or ambiguous.  *Id.* at 9.  Because BCA did not protest the "A" rating requirement sooner, BCA's current protest is untimely.  *Id.*

In the alternative, the TEP properly downgraded BCA's proposal, because BCA failed to provide insurance carriers with "A" ratings from accepted insurance industry rating firms.  Int. Mot. at 12-13.  Although BCA submitted financial data for unrated providers, BCA glosses over the fact that both were unrated and, therefore, BCA's proposal did not satisfy the "A" rating requirement.  *Id.*  The agency decided to rely on insurance ratings and properly downgraded BCA's proposal for failing to satisfy this requirement.  *Id.* at 13.  When the TEP questioned BCA's lack of "A" ratings, BCA confirmed that [deleted] and [deleted] were unrated.  *Id.* at 11. At the debriefing, the Contracting Officer also noted that "BCA failed to meet the [S]olicitation requirement that all providers possess a minimum rating of 'A' or better."  AR at 2234. Although [deleted]'s underwriter is "A" rated, BCA did not contract with the underwriter, it contracted with [deleted].  Int. Mot. at 11.

### b.    **The Court's Resolution.**

To support BCA's misleading discussions claim regarding provider ratings, BCA relies primarily on *Metro Mach. Corp.*, B-281872, B-281872.2, B-281872.3, B-281872.4, 99-1 CPD ¶101 (Comp. Gen. April 22, 1999).  *See also* 4/7/10 TR at 21:16-24:4.  In that case, the Solicitation required that the successful bid provide a "mooring location" within 90 miles of

Jacksonville, that the disappointed bidder's proposal complied with. *Metro Mach.,* at *2. The disappointed bidder, however, also offered to provide production services at a separate facility in Norfolk. *Id.* at *4. The agency asserted that production facilities were to be located at or relatively near Jacksonville as well. *Id.* The GAO found that there was "nothing in the above RFP provisions that necessarily preclude[d] an offeror's use of a Norfolk production shop" to provide distinct services other than mooring ships pending repair. *Id.* at *12. Therefore, the GAO concluded that the procuring agency misled the protestor by asking questions about mitigation instead of stating that an alternative facility for production services was not acceptable. *Id.* In this case, however, the Solicitation explicitly required that all providers have an "A" rating. AR at 33-34 ("The contractor shall provide dental [and vision] care from A rated insurance companies or better.").

BCA elected, however, not to proffer providers that met the requirements of the Solicitation. Accordingly, the TEP could have eliminated BCA at this juncture. *See* FAR 15.305(a) (stating that agencies must evaluate proposals "solely on the factors and subfactors specified in the solicitation"); *see also Ashbritt, Inc.* v. *United States*, 87 Fed. Cl. 344, 374 (2009) ("Proposals must be evaluated in accordance with the terms of the [S]olicitation."). Instead, the TEP invited BCA to submit a final revised proposal and reminded BCA that it "did not provide ratings for [deleted] or [deleted]. What are their ratings?" AR at 1799. Although the TEP did not specifically warn BCA that it must use only providers with an "A" rating, the TEP never suggested that BCA could satisfy the Solicitation's requirements by submitting alternative financial information. AR at 33-34, 1799.

Under the FAR, if the government determines that discussions should be held, discussions must be held with each offeror in the competitive range of a negotiated procurement. 48 C.F.R. § 15.306(d)(1). In addition,

> [a]t a minimum, the contracting officer must . . . indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond. The contracting officer also is encouraged to discuss other aspects of the offeror's proposal that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award.

48 C.F.R. § 15.306(d)(3).

As a matter of law, however, the Contracting Officer "is not required to discuss every area where the proposal could be improved. The scope and extent of discussions are a matter of contracting officer judgment." 48 C.F.R. § 15.306(d)(3). In this case, BCA was asked to provide ratings as the Solicitation required. The fact that the TEP allegedly did not inform BCA of the absolute necessity to provide the ratings, instead of alternative financial information, was not misleading. In *DMS All-Star Joint Venture* v. *United States*, 90 Fed. Cl. 653 (2010), the court recently recognized that caselaw from the United States Court of Federal Claims "examining allegedly 'misleading' discussions is sparse." *Id.* at 669. An "agency's discretion in holding discussions is not a license to mislead an offeror," however, the discussions need not

"address all aspects of a proposal that are less than optimal." *Id.* at 669-70 (quotations and citations omitted). The Administrative Record in this case does not support BCA's allegations that the TEP engaged in any conduct that was or could be construed as misleading.

For these reasons, the court has determined that BCA's misleading discussions claim regarding the required "A" ratings for providers does not provide a sufficient legal basis to sustain this protest.

### 2.   Eyeglass Frame Discounts.

#### a.   The Parties' Arguments.

##### (1)   Plaintiff's Argument.

BCA also argues the TEP misled BCA by not informing BCA that failure to comply with the eyeglass frame discount requirement would disqualify BCA from being awarded the contract. 4/7/10 TR at 29:22-30:5; 30:20-31:14. Instead, the TEP asked only whether BCA would offer such discounts. Pl. Resp. at 8. BCA's principal, [deleted], verified via e-mail on July 15, 2009, that the required eyeglass discounts would be offered, but not until BCA was awarded the contract since [deleted] would have to contact each of the 15,000 providers individually to re-negotiate discount terms. *Id.* at 7. In response to a similar question, Benalytics simply affirmed it would comply with the Solicitation. *Id.* at 7-8. BCA, however, was downgraded for providing more detail. *Id.* at 7-8.

##### (2)   The Government's Response.

The Government responds that BCA conceded that it was "impossible" to comply with the Solicitation's eyeglass frame discount requirement prior to award of the contract. Gov't Mot. at 18 (citing AR at 2153-54). Although BCA claims to have sent a clarification e-mail that [deleted] would negotiate the required discount with contractors within three weeks after award of the contract, the SEC has no record of receiving this e-mail. *Id.* at 19; *see also* 4/7/10 TR at 16:12-16. In any event, although BCA may have intended to offer an eyeglass frame discount after the contract was awarded, a representation to that effect is not a substitute for compliance with the Solicitation. Gov't Reply at 10-11. Failure to so comply precludes BCA from being awarded the contract and renders it impossible for BCA to show the necessary prejudice. *Id.* at 11-12.

### (3)    Defendant-Intervenor's Response.

Benalytics also argues that the TEP did not act in an arbitrary or capricious manner when it downgraded BCA's proposal, because BCA failed to include the required eyeglass frame discounts.  Int. Mot. at 13.  BCA concedes that it initially failed to meet this requirement.  *Id.*  When the TEP asked BCA for clarification, BCA responded that [deleted] would notify providers, if BCA were awarded the contract.  *Id.* at 13-14.  Conversely, when the TEP asked Benalytics a similar question, however, Benalytics responded that it would comply with the Solicitation.  *Id.*  Although BCA may have wanted additional opportunities to address this issue, the TEP's downgrade of BCA's proposal properly was within the agency's discretion.  *Id.*

### b.    The Court's Resolution.

The Solicitation required that the SEC receive a minimum discount for in-network eyeglass frames of 45% off usual and customary charges up to $130 and 80% of the balance over $130.  AR at 102.  BCA's proposal, however, only included a discount of [deleted] for frames up to [deleted], plus [deleted] off the amount over [deleted].  AR at 2234.  The TEP's further inquiry did not suggest that BCA's non-compliance was acceptable.  AR at 2153.  Although the Solicitation specified that the SEC reserved the right to waive "informalities and minor irregularities" in proposals and make multiple awards, the agency also could reject any or all proposals, if doing so was in the agency's interest.  AR at 83; *see also* FAR 15.305.  Therefore, the TEP's decision to downgrade BCA's final proposal, because of the failure of the proposal to offer the minimum eyeglass frame discount, was well within the TEP's discretion.  Moreover, the Administrative Record does not support BCA's allegations that the TEP engaged in any conduct that was or could be construed as misleading.

For these reasons, the court has determined that BCA's misleading discussions claim regarding eyeglass frame discounts does not provide a sufficient legal basis to sustain this protest.

### B.    Unequal/Disparate Treatment Claims.

BCA also claims that the TEP treated BCA and Benalytics differently regarding the "A" rating and eyeglass frame discount Solicitation requirements.

### 1.    "A" Ratings.

### a.    The Parties' Arguments.

### (1)    Plaintiff's Argument.

BCA argues that, although [deleted] was not rated, it was underwritten by [deleted] and [deleted].  AR at 1852.  Benalytics proposed Humana as a provider but, according to A.M. BEST, Humana had no financial rating.  *See* 4/7/10 TR at 25:14-26:19.  Instead, the policies would be underwritten by Humana Insurance Company, Humana Insurance Company of Kentucky, or Humana Health Benefit Plan of Louisiana, Inc., all of which were "A" rated.  AR at 2019.

Therefore, technically both offerors proposed insurers that were not "A" rated, but that were backed by "A" rated companies.  Pl. Mot. at 23; *see also* 4/7/10 TR at 26:22-27:1 ("[B]ecause both BCA and Benalytics proposed companies that either were not rated or had a lower rating than was required.  Both of them arguably [did not meet] the [S]olicitation.").  Accordingly, the award to Benalytics was improper and should be set aside.  Pl. Resp. at 19-20.

### (2)     The Government's Response.

The Government responds that BCA failed to establish that Benalytics' proposal did not comply with the Solicitation.  Gov't Mot. at 14-15.  Benalytics' vision insurance carrier Humana had an "A" rating, and was legally responsible for providing vision benefits, rendering the lack of a rating for Humana's subcontractor EyeMed irrelevant.  Gov't Reply at 13-14.  Benalytics and Humana were obligated to provide the services specified in the Solicitation irrespective of EyeMed's participation or withdrawal.  *Id.* at 14.  The TEP's refusal to accept the ratings of [deleted]'s sister companies and acceptance of the "A" rated Humana was consistent with the terms of the Solicitation.  *Id.*  In this case, Benalytics' offer provided that all of the insurance carriers Benalytics planned to utilize had an "A" rating.  AR at 1981.  On the other hand, [deleted] and [deleted] were not independently rated.  AR at 1852, 1972.  Therefore, BCA's argument that these insurance carriers should receive ratings based upon affiliates that were not serving as the contractual insurance carrier contradicts the Solicitation's instruction to provide dental and vision care from "A" rated insurance companies.  AR at 33-34.

### (3)     Defendant-Intervenor's Response.

Benalytics' named "A" rated Humana Vision as its vision provider.  Int. Mot. at 26. Although Humana Vision uses EyeMed Vision Care, a non "A" rated provider, Benalytics subcontracted with Humana Vision, the responsible party under the contract.  *Id.*  Moreover, Humana Vision was obligated to resolve any problems that may arise with EyeMed Vision Care, such as finding another provider or using one of its own providers.  *Id.*

In effect, BCA wants the court to find that Benalytics failed to comply with the Solicitation and also that BCA merits a higher rating.  *Id.* at 32-33.  The TEP properly evaluated both proposals in accordance with the Solicitation.  *Id.* at 33.  BCA's disagreement with the TEP's evaluation does not establish the lack of rational basis necessary to overturn the contract award to Benalytics.  *Id.*

### b.     The Court's Resolution.

BCA admits that there is no evidence in the Administrative Record that Benalytics proposed providers that were not "A" rated.  4/7/10 TR at 25:23-26:1 ("Now I will say, in the interest of full disclosure, the government didn't recognize that [The Delta Concern, Inc.] was B++ rated.  It's not in the record.").  In the bid protest context, however, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."  *Camp* v. *Pitts*, 411 U.S. 138, 142 (1973).  The court, therefore, must assess the reasonableness of procurement decisions, in the first instance, based only on information considered by the agency in reaching a decision.  *See Axiom Res. Mgmt.,*

564 F.3d at 1381 ("The focus of judicial review of agency action remains the administrative record, which should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the APA."). Therefore, BCA's unfair/disparate treatment claim regarding Benalytics' provider ratings has no support in the Administrative Record.

For this reason, the court has determined that BCA's unequal/disparate treatment claim regarding the required "A" ratings for providers does not provide a sufficient legal basis to sustain this protest.

### 2.      Eyeglass Frame Discounts.

#### a.      The Parties' Arguments.

##### (1)      Plaintiff's Argument.

Finally, BCA argues that despite the TEP's determination that Benalytics "met and/or exceeded all the minimum requirements and [earned] an overall rating of Commendable," Benalytics' proposal had several inconsistencies that call this rating into question. Pl. Mot. at 17-18 (citing AR at 2014, 2160, 2096); *see also* 4/7/10 TR at 33:9-36:3. Both the Government and Benalytics concede that Benalytics' proposal was inconsistent and ambiguous as to whether it met the minimum requirements for eyeglass frame discounts. Pl. Resp. at 17. In addition, the TEP's willingness to take additional steps to clarify Benalytics' proposal evidences disparate treatment, because the TEP did not extend this same opportunity to BCA. *Id.* For example, Benalytics was asked directly whether its proposal met the minimum requirements, whereas BCA was asked open-ended questions. *Id.* In addition, the TEP's failure to conduct multiple rounds of questioning with BCA, as it did with Benalytics, denied BCA equal treatment. *Id.* at 18-19. If the TEP had treated BCA the same as Benalytics, the TEP would not have downgraded BCA's proposal and BCA would have been awarded the contract. *Id.*

Although Benalytics' representations in the "Dental and Vision Benefits Matrix" appear to meet the Solicitation's requirements, other proposal information contradicts that matrix or creates a significant doubt about Benalytics' compliance with the Solicitation. Pl. Mot. at 17. Specifically, Benalytics' proposal indicates that it offered a $90 co-pay for lenticular lenses, but Humana Vision, the actual provider, does not list lenticular lenses in its coverage. *Id.* (citing AR at 2133). In addition, Benalytics claims to conform to the Solicitation's requirement that dental and vision premiums must remain constant, unless SEC enrollment increases by 20% or more. *Id.* at 18. Humana Dental, however, only guaranteed rates for two of the contract's four years, provided that enrollment does not increase by 10% or more. *Id.* at 17-18 (citing AR at 2014, 2096); *see also* 4/7/10 TR at 35:7-11 ("[I]t was arbitrary and capricious for the agency to note that [BCA] failed to comply with a particular eyeglass frame discount and failed to note that similarly Benalytics [also] failed to comply with other similar requirements.").

##### (2)      The Government's Response.

The Government responds that the Solicitation only requires a discount for complete pairs of glasses, that Benalytics confirmed it would provide. Gov't Reply at 14-15; *see also* AR

at 90 ("Additional Eyewear . . . 45% off complete pairs of glasses after initial benefit has been used."). Although BCA alleges that Benalytics' proposal contained inconsistencies that would prevent it from meeting the minimum requirements of the Solicitation, namely ambiguity regarding: coverage for lenticular eyeglass lenses and coverage for contact lens fitting; follow-up appointments; and disposable lenses, the Administrative Record establishes that Benalytics met all the Solicitation's requirements, as confirmed by discussions with Benalytics and Humana. AR at 1773-74, 2155, 5136.

The Administrative Record also shows that the TEP reached out to both offerors in a single set of clarification discussions. AR at 1774-75. Under the FAR, the TEP was entitled to tailor discussions to each offeror's proposal but end discussions with BCA, when BCA made it clear that it could not comply with the eyeglass frame discount requirement. *See* 48 C.F.R. § 15.306(d)(5) ("If, after discussions have begun, an offeror originally in the competitive range is no longer considered to be among the most highly rated offerors being considered for award, that offeror may be eliminated from the competitive range whether or not all material aspects of the proposal have been discussed, or whether or not the offeror has been afforded an opportunity to submit a proposal revision (see 15.307(a) and 15.503(a)(1)).").

### (3)   Defendant-Intervenor's Response.

Benalytics' proposal complied with the Solicitation and was not ambiguous. Int. Mot. at 17. Although BCA points to inconsistencies in the pricing change mechanism of Benalytics' proposal, the proposal's Schedule controls, because FAR 52.215-8(a) provides that the Schedule takes precedence in the Uniform Contract Format. *Id.* at 19. Therefore, Benalytics' proposal was not ambiguous and the SSA properly made the award to Benalytics, relying on the Schedule pricing sheets. *Id.* Unless Benalytics could not comply with the Solicitation, the court should leave agency's decision undisturbed. *Id.*

### b.   The Court's Resolution.

BCA correctly notes that Benalytics' Final Revised Proposal has conflicting provisions on when prices will be renegotiated. In Section B, Pricing/Costs, of the proposal, Benalytics states that "[i]f the SEC's population exceeds 20 percent, prices will be renegotiated." AR at 2005. The proposal, however, in sections Benalytics' providers, Humana Dental and Humana Vision, prepared for the proposal, states that "[i]f enrollment changes by +/- 10 percent from the quoting enrollment . . . [Humana] reserves the right to re-evaluate rates." AR at 2014; *see also* AR at 2096 (reserving the right to adjust rates effective January 1, 2010).

During discussions, however, Benalytics clarified both verbally and in an e-mail that it would comply with all Solicitation requirements. AR at 2155 ("I would like to officially confirm in writing that the revised Humana Dental Plan that was submitted on July 13, 2009 was intended to match the SEC specifications as well as all addenda."); *see also* AR at 5136 ("This confirms our verbal discussion a few minutes ago – we are matching the minimum requirements.").

As a matter of law, however, the pricing information in Benalytics' Schedule takes precedence over any conflicting information under the Uniform Contract Format.  *See* 48 C.F.R. § 52.215-8(a).[9]   Therefore, it was within the TEP's discretion to conclude that Benalytics' proposal complied with all Solicitation requirements.  BCA also argues that Benalytics proposed a 45% discount for eyeglass frames, but only if the employee was purchasing a full pair of eyeglasses, not just frames, as the Solicitation required.  AR at 2019.  Again, BCA correctly argues that Benalytics' proposal is inconsistent with respect to whether Benalytics complied with the discount for eyeglass frames.  AR at 2019 ("Frame, lenses, and lens option discounts apply only when purchasing a complete pair of eyeglasses.  If purchased separately, members receive 20% off the retail price."); *see also* AR at 2133 (stating that Benalytics' proposal will comply with Solicitation and offer "45% off usual and customary charges up to $130; 80% of balance over $130.").  Benalytics, however, confirmed in writing, after discussions with the TEP, that it would match all minimum Solicitation requirements.  *See* AR at 5136.  The TEP's subsequent decision to downgrade BCA's final proposal, without affording BCA the opportunity to submit a revised proposal, however, did not demonstrate disparate treatment.  At that juncture, the TEP could eliminate BCA from the competitive range, if it determined that BCA could or would not comply with the eyeglass frame discount requirement.  *See* 48 C.F.R. § 15.306(d)(5).

For these reasons, the court has determined that BCA's unequal/disparate treatment claim regarding eyeglass frame discounts does not provide a sufficient legal basis to sustain this bid protest.

---

[9] FAR 52.215-8(a) provides, in relevant part:

Any inconsistency in this solicitation or contract shall be resolved by giving precedence in the following order:

(a) The Schedule (excluding the specifications).
(b) Representations and other instructions.
(c) Contract clauses.
(d) Other documents, exhibits, and attachments.
(e) The specifications.

48 C.F.R. § 52.215-8(a).

**V.      CONCLUSION.**

For the reasons discussed herein, Plaintiff's December 30, 2009 Motion For Judgment On The Administrative Record is denied.  The Government's January 20, 2010 Cross-Motion For Judgment On The Administrative Record is granted.  Benalytics' January 20, 2010 Motion for Judgment on the Administrative Record is moot.  The Clerk of the United States Court of Federal Claims is directed to enter judgment in favor of the Government.

**IT IS SO ORDERED.**

_s/Susan G. Braden _
**SUSAN G. BRADEN**
**Judge**